Statement of the Case.
NICHOLLS, J.
Plaintiff sues to recover from the defendant damages for personal injuries alleged to have been received by him while employed at the Rayon cotton gin, in the town of Rayne, in Acadia, which was at the time leased and operated by the defendant, which injuries he alleged resulted in the loss of his left arm near the shoulder. The injury he averred occurred without any neg- *571 ligenee on his part, but through the gross negligence and fault of the defendant. He alleged that it was well known to the defendant that he was inexperienced in the handling of and the attending to the machinery in the gin leased and operated by the defendant to which he was assigned; that on the day of the injury a certain gin stand became choked; that he had no experience in the cleaning of machinery, nor was he previously instructed in the said work; that he was going back to the engine room to instruct the engineer to stop the machinery, so he could clean out the said gin stand; that while on his way he was stopped by the said manager of said gin, petitioner’s superior, one Sully Rayon, who peremptorily directed and compelled petitioner to return and clean the said gin stand while in motion, informing petitioner that there was no danger in doing so; that petitioner, relying upon the superior knowledge of the said manager, and not knowing of any defect in said machinery, began cleaning the said gin stand as directed by his said superior, when, without his negligence or fault, the lever which adjusted the machinery so as to separate gin or saw from the ribs, through some defect in the machinery, lost its hold, causing petitioner’s left hand to be caught in the gin teeth or saw, drawing the same into its grasp, resulting in cutting, tearing, and lacerating petitioner’s left hand from his body, just below the elbow, causing him immense and agonizing pain, from which he suffered more or less for over 60 days, and up to the present time has been unable to perform any labor whatsoever, having not entirely recovered from pain caused from the said accident.
That the said gin stand, its shafting, idlers, levers, etc., were defective, due to faulty construction and negligence on the part of the said Suberbielle, to the knowledge of the said Suberbielle and his manager, but unknown to petitioner, and that he was induced to undertake the dangerous employment which caused the accident upon the positive assurance of the said Suberbielle, acting through his manager, Sully Rayon, that no danger existed in the undertaking, which resulted in the accident and loss of his arm.
Defendant answered, pleading first the general issue. He averred that in operating the same he had, with due regard to the safety of his employSs, provided gins, machinery, and other implements of work of safe, approved, and commonly used pattern, as well as safe places in which and means with which to perform the task allotted to each employs; that he had also furnished an experienced and cautious manager to control all operations.
He averred that in the course of his business it became necessary to employ a ginner to operate one of the several gins in the gin house; that the plaintiff, learning of this, voluntarily applied to Sully Rayon, the manager of this employment, declaring himself to be an experienced ginner, familiar with all the details of such work, besides being trained as a mechanic.
That Sully Rayon, acting for defendant, and relying implicitly upon the representations of said plaintiff as to his capacity for the work in which he sought employment, did give such employment.
That defendant, even now, had no reason to doubt but that said plaintiff had the experience which he claimed for himself; but that of the plaintiff's own initiative, and despite a well-known and established rule promulgated and brought to the attention of all ginners, not to undertake to clean gins while the machinery was in operation (but to do so after the day’s work was over and the machinery had stopped), did undertake to clean the gin stand at which he had been engaged while the machinery was in operation, and undertook to clean the said gin stand, not in the approved and usual manner, which was *573 from aboye and with the use of a sharp instrument, but from underneath, where he could not see what he was doing, and with his hand, which, under no consideration or circumstance should have been used for the extremely dangerous wort of cleaning a gin when the machinery was in operation.
He stated that, instead of using the safe and approved manner of doing his work, plaintiff voluntarily selected the most perilous; and by this unpardonable negligence and lack of all caution on his part, in undertaking to do this work in the manner indicated, in violation of the rules prevailing in the Rayon gin, as well as in violation of common sense and ordinary caution, the said plaintiff brought upon himself the unfortunate accident with which he now seeks to burden defendant.
And, however pathetic may be the plight in which petitioner finds himself, it was the direct result of his own negligence, and for which he cannot with justice charge the defendant.
In view of the premises, he prayed that the demand of plaintiff be rejected and denied, with costs.
The cause was tried before a jury, which returned a verdict in favor of the plaintiff for $500. Judgment was rendered accordingly.
Plaintiff has appealed.
The jury which tried this case found in favor of the plaintiff the questions of fact upon which its verdict was made to rest. In view of the extent of the personal injury which he is shown to have received, the amount accorded to him as damages is entirely too small. Defendant draws from that fact the inference that the verdict was a sympathetic one, and contends that plaintiff is entitled to nothing whatever. On the other hand, plaintiff’s attorney attributes the smallness of the damages to the fact that defendant is á resident of the parish of Iberia, while the plaintiff is a stranger there. We have examined the record with care, and, whatever may have been the motive which induced the jury to award to plaintiff the small amount they did, we are of opinion that the finding in his favor of the facts of the case was unquestionably correct.
Plaintiff, as a witness, testified that he was 22 years old, going on 23, a resident of Rayne, in Acadia parish, La., having resided there about 20 years, going there when he was 2 years old. In the early part of' the fall he worked at the oil mill — Mr. Suber-bielle’s oil mill — situated in the west part of the town of Rayne. He worked at some time during that fall for Mr. Rayon at his gin at the gin house. He could not remember the exact date at which he entered into this employment, but stated that approximately he worked for him about three weeks, and up to the time of the accident, though not working steadily. During those three weeks he was engaged in buying cotton, and at other times in running the gin stand. He stated that one day he was passing the gin house and spoke to a young man there, who told him he was going away and asked him to take his place. He said he had never run a cotton gin and the other replied: “That is nothing. You will soon catch on. When I came, I did not know either.” Witness then said: “If I do, will Mr. Rayon show me?” And the other said: “Mr. Rayon will.” And witness said: “If he will show me, it will be satisfactory.” The young man went with him to Mr. Rayon and said: “Mr. Rayon, here is a young man to take my place.” And Mr. Rayon said: “All right.” And witness said to him that he had never run a gin stand before, not for 10 minutes, and Rayon said: “All right.”
This young man was called Daspit. A few days after this conversation, witness went into the employment of the Rayne cotton gin. Before the accident occurred he undertook the running of the gin stand off and on. *575 Some days Re was buying cotton. Mr. Rayon attended to tbe gin stand bimself. He was trying to find a ginner. He wanted to find one. But wben be (McBailey) was not there be did it bimself. He bad no instructions whatever. He could not say exactly bow many days he bad worked at tbe gin stand proper before the accident, but be supposed probably one-balf of the time. Some days they did not run at all, because there was no cotton there. He put in about 7, or 8, or 10 days at tbe ginning, and tbe rest of tbe time was out buying cotton. Rayon tried to get him to go back of town and get a negro who was said to be a machinist; but be got in so late in tbe evening that be did not go to get tbe negro, and in the' meantime be got a job on tbe railroad, and be did not get him at all. Witness was- told be was a machinist, and in turn be told Rayon about it. Rayon wanted tbe man to run tbe gin stand. Mr. Rayon never did show him much about the gin stand. Two or three days before the accident Mr. Rayon bimself took up tbe job of cleaning it (while it was running). He started to clean it, and called to him (McBail-ey) to finish it. That was about three days before tbe accident happened. He thought it was on Saturday, and the next Tuesday tbe accident happened. Tbe accident occurred in the following manner: It was in tbe evening after dinner, and there was no more cotton coming down in tbe gin stand, and be started back to go to tbe place to see if the cotton was out of the place, and he started to call tbe engineer, and there was no signal. I-Ie then saw Percy Ogden and John Robira. They bad come to see Mr. Rayon. He spoke to them, and Mr. Rayon came out to see them, and be looked and said: “Mc-Bailey, clean out your gin stand; clear out your gin stand” — -and spoke as if it were to be done right away, and witness went to work to clean it out,- to clean out tbe gin stand, and wben be was starting to do it the breast plate was shaking so badly that be put up his left band on it to steady it, wben tbe breast gave way and it drew him in. He tried to pull it away. It drew his band in — his arm in. He screamed for help. He did not pull very bard, and they raised tbe lever, and it did not seem to raise very well, and be got bis band and arm out of tbe gin stand himself. He bad to pull back with all bis might. Tbe gin stand seemed to carry him in forward, and it seemed to have more speed after raising tbe lever, and wben he pulled so bard it just tore bis band away. It remained in the gin stand. He bad bis right band pulling out tbe cotton, and be supported the breast with bis left hand. I-Ie placed bis band on tbe breast plate to support it. It was shaking very badly. There were three other gin stands in that gin. He was no machinist, and could not say what was tbe condition of the gin stand. He did not know; but be did know that it gave more trouble than all tbe rest. He did not know any other way to stop tbe gin. from operating without stopping tbe engine. He was going to tbe engineer wben be was stopped by Mr. Rayon. Mr. Rayon was tbe manager of tbe gin. He hired him and was in control of the mill. He did not remember seeing Mr. Suberbielle around there. Mr. Rayon gave tbe orders. He did not know any other way of stopping tbe gin stand without stopping tbe engine. Mr. Rayon gave him no instructions — no instructions how to stop tbe gin stand when it became choked. 1-Iis manner on the evening of tbe accident was very ill. He seemed to be angry. I-Ie wanted bis employés to do what be wanted just at that moment. He wanted it done right away. Mr. Rayon cleaned out tbe gin stand tbe way be (McBailey) did it three days before, and be said there was no danger in it. He had been there doing that same way for 18 years, and bad never bad an accident.
*577 He thought the accident occurred on Tuesday. A few days before he started to clean it out himself, • Rayon said: “If you are afraid, let me do it.” And he jerked off the breast apron and threw it down, and he said: “There is no danger. I have done it before. I had 18 years’ experience, and have had no accident.” And he told him to finish it, and his (McBailey’s) father-in-law helped him to clean it, with Mr. Moise Arceneaux.
He thought this occurred on Saturday before the accident befell him, which caused him great pain and suffering; the greatest he had eyer had in his life. After his arm was cut off he certainly suffered a great deal. They had to burn the flesh to get it off. He did not think a living man could suffer any more than he did. He still felt the pain. It pained him yet. He had been doing nothing since the accident, not being able to perform any labor. He was in good health prior to the accident — in a healthy state, and able to do almost any kind of work. He suffered at the time the accident occurred. It seemed as if he was being ground to pieces. It looked as if his whole body was being ground to pieces. He suffered agony.
When Mr. Rayon raised the lever and could not stop it, he (McBailey) pulled his hand off of the arm and left it up to the elbow, and it threw him head over heels, when he gave the great pull. It pulled his hand right off. "There was nothing but the bone left up to the elbow; the hand remained in the cotton gin. There was about six inches of his arm still left. He had medicine on it then; but he put the medicine on himself. The doctor had just stopped. He had not paid out any money for medical attention yet; but he owed Dr. Young about $101, and Mau-boules, for drug bills, about $18.
At the time of the accident he was earning $1.75 a day. He was .a married man. He considered he had been damaged as the result of this accident about $3,000 for suffering and $7,000 for the loss of his arm, $250 for loss of time, and $175 for doctor’s bills and drug bills, whatever they might be. He could not have gone to the engineer of the gin and signaled to him to stop the machinery without going back and talking to him in person. There was a little hole there you had to see him. You could not see him if you did not go there. That was about 20 feet from the gin where the accident occurred, he guessed — somewhere around that, maybe not so far, but it was about that, he thought. Mr. Rayon, the manager of the gin, gave him no instructions whatever regarding placing his hands on this breast plate which separated the gin saw from the ribs. He- only told him there was no danger of the machinery in cleaning the gin stand while running. He never at any time told him to stop the gin if he wanted to clean it. The custom was, when the gin stand choked, he wanted us to clean it while running. That was the second time Mr. Rayon had made him clean it while running. It was the second time when he got hurt.
He knew of no rule in that gin requiring the machinery of the gin stand to be stopped before attempting to clean the gin. Mr. Rayon never told him any, and no one else. There was only one rule, and that was written with chalk. That rule was: “Do not spit on the floor.” He did not know the condition of the machinery. 1-Ie was no machinist. The building, at the south end of it (the roof), was somewhat bad. Some part of it was off over the machinery where the accident happened. The building was dilapidated. As far as he knew it was not being put in repair. The first time he knew Mr. Sully Rayon, the manager of the gin, personally, was when he went to work for him. He never had anything to do with him in business. He worked with him about three weeks prior to the accident. He was in a position during those three weeks to judge of *579 his disposition. He was very high-tempered, and seemed to get angry at most every little thing that happened.
Cross-examined, witness stated that the whole building of the gin was bad. The roof overhead where the accident happened had a hole in it. He did not know if the floor on which the gin stood was a solid floor. He did not know that the floor upon which the gin stand was located was not constructed in a firm and substantial manner. He did not examine the floor. The only defect he knew of was in reference to the bad.roof of the building. Mr. Rayon never sent for him to be employed as a ginner. lie never sent for him, and asked him to work for him .as a ginner; that is, before he was employed, he never sent for him and asked him to work. As just stated, he met the young man that was working there, who told him that he was going to quit and go home, and asked him (McBailey) to take his place. Witness told him he did not know anything about it Mr. Rayon and Mr. Suberbielle positively did not send for him. This young man that was working for him told him (McBailey) he was going to quit and go back home, and asked him to take his place, and he went with him to Mr. Rayon. He did not ask Rayon to employ him as a ginner. The young man told him he was running a gin stand. He (McBailey) had stated that the young man had told him that he did not know much when he went there, and he told him he (witness) knew nothing about the gin stand, and Daspit said that he would soon catch on — that Mr. Rayon would show him.
Mr. Daspit was said to be a ginner. But he did not see him running the gin stand. When he went with Mr. Daspit to see Mr. Rayon, he knew he was going to see Rayon for the purpose of taking the position of Daspit, who was a ginner. He knew he was applying for that position. He went to see if he would not instruct him about this gin stand, for he had learned, and he (McBailey) would learn it, and after he had learned it Mr.' Rayon said that he would raise his wages, and so at the time he thought he would strike a bargain with Mr. Rayon and take charge of the gin. He promised to pay him as a starter $1.50 a day. He said, after he had learned to operate it better, the wages as a ginner would be raised; did not go to work immediately as a ginner under wages, but tried to do his best with his showing; took charge of the first gin stand on the south end of the building where he got hurt, but did not know it by the name of gin stand; took charge of the gin stand about three or four days after his first conversation with Mr. Rayon. Mr. Rayon did not teach him the morning he went there; did not give him a lesson that morning as how to operate that gin. Nobody gave him a lesson. Had never operated one before that day. He knew how to pull the rod and leave the cotton down. That is all he knew how to do without any instructions. Expected Mr. Rayon to instruct him, and kept on hanging round, and the only way he could get along was on what he would figure out for himself. He told him he would instruct him. He told him he was going to instruct him, and he thought it was bis duty to do it. He thought it was his duty, especially after he did not ask him to do the work. He did not like to monkey with him (Rayon). He was a very high-tempered man. He did not ask him for his instructions. He went along, doing the best he could, waiting for him to instruct him. He operated the gin in that manner until he got hurt. Did not know exactly how many days that was he worked around the gin. He thought it was about three weeks. Worked about one-half of the days at the gin stand itself — about one-half of the time. He left the gin operating and went out buying cotton, and Mr. Rayon operated the gin stand himself. He said that he was looking around *581 for a ginner. He said that he could not get one. On the day the accident occurred he (McBailey) had started round to see if the cotton was out of the breast and then stop the engine; to see if there was no more cotton to gin, and if there was no more cotton, to stop ginning; to stop ginning, if there was no more cotton to gin, and then he would stop the engine; and he waited for Mr. Rayon’s instructions to see what else to do. He stopped, because Mr. Rayon stopped him. Mr. Rayon told him to clean out that gin stand, as if he was in a terrible hurry. He kept repeating to “clean out your gin stand; clean out your gin stand; clean out your gin stand.” He then went back to his gin stand. It was running, but there was no cotton coming out. He guessed Mr. Rayon knew it was running. He guessed he could see. He passed close by. He did not know how long it was before the accident occurred. When he first started out, Mr. Rayon was standing about 15 feet from him. When he first started to clean the stand, Mr. Rayon was talking to John Robira, and to Mr. Ogden also. He thought he was at the top of 'the steps of the gin house talking to Messrs. Ogden and and Robira; did not know whether his back was turned, or his face. When he (McBailey) started round to take off the strap to clean the gin stand, he stopped him. He said to clean it out. That is all he said. “Clean out your gin stand; clean out your gin stand; clean out yo.ur gin stand” — as if he wanted it done right away, before he had time to start to clean it. He did not think there was any cotton in the gin at that time. If there was any, there was very little. He did not know whether there was any at all. He did not believe he saw any cotton in the gin at the time. If there was no cotton, they would be through with the day’s ginning. He was going to see if the cotton was out of the breast. He did not know whether Mr. Rayon would rip and swear and tear if he stopped the engine or not. He had no instrument to clean the gin when he was working it; nothing at all, except his fingers. He pulled the cotton out. He cleaned the cotton gin in operation with his bare hands, pulling cotton out of the top of the ribs with his bare fingers. The gin was in operation with the breast raised. The saw was not between the ribs while the breast was raised. They were under the breast. Mr. Rayon never gave him any sharp instruments for the purpose of cleaning the saws. He was no ginner; did not know what it would take to clean the gin; did not ask Rayon for anything with which to clean the gin; did not know there were any instruments used to clean out the gin. It did not strike him as an extremely dangerous thing for a man to clean a gin while running. Mr. Rayon told him he had 18 years’ experience, and that there was no danger in it. 1-Ie said that when the breast was raised there was no danger. He (McBailey) was a youngster, knowing nothing about it. So why should he not believe him? He did not know whether it was dangerous or not He was told there was no danger; and why should he v think there was, when a man who' had 18 years’ experience told him there was no danger? When he was cleaning out the gin stand, the breast was shaking so badly that he put his hand on the wooden part to hold it steady. That was his left hand, and with his right he was stripping the saws, and the breast was shaking so much that it shook the saws, and it began to pull him in, and he screamed three times for help, and Mr. Rayon came, and he raised the lever, and it did not seem to cheek the speed, and he had to pull with main force, leaving his hand in the gin saw. He was cleaning the gin from above with his right hand, and he had his left hand on the breast plate — the wood part. He had no knowledge whatever that there was danger in cleaning his gin with his fingers. If he had had the least thought that there was *583 danger in it, he certainly would not havc-done so.
Recalled, and testifying in rebuttal, Mr. McBailey said: When, employed by Mr. Rayon to work in tbe gin at Rayne a man by the name of Daspit was present — no one but him and witness and Mr. Rayon. . Mr. Daspit brought him to Mr. Rayon. Witness positively did not tell Mr. Rayon that he had any experience in running a gin saw. He did not tell Mr. Rayon he was a ginner. Mr. Daspit asked him if he wanted his job. Mr. Daspit spoke to Mr. Rayon about leaving, and Mr. Rayon asked witness to take that position (the position that Mr. Daspit had at the gin stand), and he said that “Mr. Daspit would show me. Mr. Daspit told me that Mr. Rayon would show me what to do.”
Mr. Sully Rayon testified that he was manager of the Rayon gin at the time the accident occurred to Mr. McBailey; that he had been employed in that gin since 1903; that he first met Mr. McBailey in town several times, but was not well acquainted with him; that he was employed by the Rayon gin on Friday, and on the following Friday the accident occurred. His former ginner was leaving Rayne to reside at another town. Therefore he had to employ another to take his place. Mr. McBailey was brought up there by Mr. Daspit, the former ginner; and Mr. Daspit introduced him as a man who could operate a gin stand.- He wanted the job, and he (Rayon) wanted a ginner. He thought he might employ this man. He asked him if he had any experience in the operation of a gin stand, and he told him that he had; that he was also a machinist. Mr. Rayon was asked if, during the 14 or 16 years he had been managing mills, he had ever employed as a ginner a man who to his knowledge knew nothing at all about a gin.
The question was objected to by counsel for plaintiff, but the court overruled the objection, and Mr. Rayon testified that he had not. He had no reason to believe, when Mr. McBailey came to him, that he knew nothing about the gin stand. If he had known that Mr. McBailey knew nothing about a gin, he would not have employed him. He depended upon Mr. McBailey’s word and information. Mr. McBailey never told him anything at any time to make him believe he was not a gin-ner, before he employed him or before the accident. He dealt with Mr. McBailey in reference to his competency as an experienced man. The gin was in fair condition. He spoke to Mr. McBailey while Mr. Ogden and Mr. Robira were there, calling his attention to the fact that the gin was choking in the ribs and that it ought to be cleaned out. He did not give instructions as how to clean the gin, because he had done the work several times before, and he did not think it necessary to instruct Mm again. In reference, to the operation of these gins — and speaking of that, as to whether it was necessary to stop all of the gins at one time or to stop them separately — Rayon said that one gin could be stopped separately, without stopping all in the factory. It was possible to stop the gin at which Mr. McBailey was working, if the belt was in a proper condition. It was the ginner’s business to take care of the belts. About an instant’s time elapsed between the operation of the lever and the pulling out of McBailey’s arm. He could not say what efforts he was making. It seemed to him that he was pulling against the action of the gin. While Mr. McBailey was working with him, he had other green hands. Mr. Gould was a green hand, and Gillery was a green hand; but it did not happen very frequently. Das-pit worked a short while. He did not hear him tell him that McBailey did not know how to run a gin. He thought he was an ordinary ginner; that he had sufficient knowledge to run another gin. He had occasion to notice that the gin was choking up and that things were not being run there like they ought to have been. He looked at it that Mc-Bailey was negligent in his work. He did *585 not tell McBailey to clean out the gin while running. He did not command. McBailey said he had worked at the Ohappuis gin and the oil mill; had worked at the linter, and that he was a practical machinist.
Taylor Daspit, Jr., under a commission, testified that he had worked in the Rayon gin for Mr. Suberbielle last year (in the month of September, he thought) at the gin stand. He knew Mr. McBailey; if it was the same man who took.his place, he knew him. He could not recall the name of the man who took his place, but he thought it was a man by the name of Wm. McBailey. 1-Ie knew how Mc-Bailey came to be employed there. When he (Daspit) left, McBailey wanted a place, and he told Mr. Rayon to take him and put him in his place; that he was leaving. McBailey did not know how to run the gin, and he (Daspit) had to show him how he ran it. He could not say whether he had ever had any experience as a ginner, but he had to show him how to run the gin. He never recommended McBailey; but, as he was leaving, he notified Mr. Rayon to put another man. As he was there, and wanted a job, he told Mr. Rayon to take him. The machinery must stop to clean the gin, or some one will get cut every time. The gins worked by him had to be cleaned from below, and it was unsafe for one who did not know how. It was the rule to stop the gin before cleaning it. This is the rule of all mills.
To cross-interrogatories he said:
He was employed at the Rayon gin about two weeks at the gin stand. He quit the job because he left Rayne to go to Breaux Bridge to live. He had enough experience to know how to run the gin, but never told Mr. McBailey anything. He simply showed him how to run the gin. He never told McBailey he (Daspit) had no experience either, and that it was not necessary to have any experience; that the manager would show him. Asked if the gin that stands farthest south was not very rickety, he replied in the negative, stating that the gin that was broken and did not run was on the north side by the press. All the other gins worked well. It was not a fact that none of the gin stands in the Rayon gin could be stopped without stopping all of them. One could be stopped without stopping the others. There was a brake on each one of them, both to start and to stop them.
Opinion.
Under the evidence adduced we reach (as the jury must have done) the conclusion that the plaintiff has no knowledge of the structure of cotton gins, how they were operated, what he was called upon to do in the event anything should go wrong about them, or what he had to avoid doing, lest danger result therefrom ; that he was not informed as to the probable consequences of his trying to steady it by placing his hand upon it when shaking; that, so far from being informed as to the risks which he would run in attempting to unchoke the gin with his hands while it was in motion, he was on several occasions directed by defendant’s foreman to do so, and told by him that he had an experience of 18 years as a ginner, and had repeatedly done so without accident, and there was no danger. In point of fact there was great danger in doing this; also great danger in placing one’s hands upon the machine when it was shaking, as the shaking itself was the result of an improper adjustment of the belts and appliances. We do not think, under the evidence, that the foreman had any reason to know or believe that plaintiff was an experienced ginner. The witness Daspit was present when plaintiff was employed, and he does not state, nor was he asked, what plaintiff had said to the foreman on that subject on that occasion. The witness denies having recommended him as a ginner, and declares that, as he was himself leaving that position and plaintiff wanted work, he told the foreman to take him. The *587 circumstances connected with the employment go to establish that the foreman would not be very particular about accepting him. Daspit, the actual ginner, was leaving in the middle of the busy season, and the services of an experienced ginner had been sought without success. The foreman took the risk of having some person do the work successfully until an experienced ginner could be found. Daspit, who was leaving his situation, was evidently not himself an experienced ginner. I-Ie says he had enough experience to operate the machine; that he showed plaintiff how to do so. What he did was evidently done of his own motion, and it did not go to the extent of entering into the details of the work or its dangers. The witness said that plaintiff did not know how to run the gin; that he had to show him how to run it; that he could not say whether he had any experience, or not, as a ginner, but he had to show him how to run it.
This opinion has already been extended to too great length. We cannot copy the testimony of the different witnesses. It suffices to say that the case is one where the employer failed to furnish proper appliances for carrying on without danger the work he was engaged in; that he failed to give to the plaintiff, who was his employé, instructions and warnings such as the occasion called for; that in truth the foreman misled him as to the dangers which might result from the work; that the employé was without knowledge as to the machinery, connected with the work he was doing, and without information given him as to what he should do or not do for his own safety.
The case in some of its features resembles that of Gracia v. Maestri Furniture Co., 114 La. 383, 38 South. 275.
We think, under the evidence, the jury did not err in returning a verdict against the defendant in favor of the plaintiff; but we are of the opinion that the amount of damages awarded to the plaintiff was too small. The amount should be increased, and it is hereby increased to $4,000.
For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment appealed from be amended, so as to award to the plaintiff against the defendant the sum of $4,000, instead of $500, and that, as amended, that judgment be, and the same is, hereby affirmed.